[No. A043213. First Dist., Div. Two. Dec. 18, 1989.]

ALLEN E. SMITH et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF
SAN FRANCISCO et al., Defendants and Respondents.

**COUNSEL**

Robert P. Capistrano for Plaintiffs and Appellants.

Louise H. Renne, City Attorney, and Paula Jesson, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

BENSON, J.—This is an appeal from the denial of a preliminary injunction. For the reasons set forth below we shall remand the case to the trial court.

### STATEMENT OF FACTS

On May 27, 1988, the Board of Supervisors (Board) of the City and County of San Francisco (City) issued a public notice that on June 27, 1988, it would hold a hearing on various reductions in medical and health services provided by the City. The notice stated that it was pursuant to Health and Safety Code[1] section 1442.5 and that at the end of the hearing, the Board would adopt a finding that the proposed changes would or would not have a

---

[1] All further statutory references are to the Health and Safety Code, unless noted otherwise.

detrimental impact on the health care needs of those affected. Attached to the notice were 11 pages providing further details on the nature of the proposed reductions.

These reductions, which totaled $17.2 million, were initiated by the mayor's office in response to a projected budget deficit of $179 million. The mayor had asked city departments to prepare two budget reduction scenarios. The first would take place, assuming Board approval, if Proposition K (increase in the Gann spending limit) were approved. Scenario two would take place if Proposition K were rejected. The Board's notice of May 27, 1988, reflected each of these scenarios.

This budgetary process was in accordance with the City's charter. Under the charter, each department executive receives from every department and office within that department a budget estimate for the upcoming fiscal year. (S. F. Charter, art. VI, § 6.200.) These budget estimates are then transmitted to the mayor's office no later than the first day of March of each year. (*Ibid.*) The mayor may then hold hearings on these estimates and may decrease or increase them. (*Id.* at § 6.203.) The mayor is then required, not later than the first day of June of each year, to transmit to the Board the consolidated budget estimates for all departments for the coming year. (*Ibid.*)

The charter further requires that, on or before June 30 of each year, the Board enact an interim appropriation ordinance. (S. F. Charter, art. VI, § 6.205.) However, the charter specifically provides that the "[B]oard of supervisors may decrease or reject any item contained in the proposed budget, and may without reference or amendment to the detail schedule and positions and compensations, decrease any total amount for personal services contained in the proposed budget, but shall not increase any amount or add any new item for personal services or materials, supplies, or contractual services, for any department, unless requested in writing so to do by the mayor. . . ." (*Ibid.*) Finally, the Board, after public hearing, and not earlier than the 15th day of July, nor later than the 1st of August of each year, must adopt the proposed budget as "submitted or as amended." (*Ibid.*)

Under this scheme the mayor submitted to the Board his budget proposals. The clerk of the Board then issued the public notice of those reductions on May 27, 1988.[2] Appellants, two indigent patients of county-funded health care facilities, brought an action for injunctive and declaratory relief on June 14, 1988. The action also sought a peremptory writ of mandate. They alleged that the May 27 notice did not comply with the requirements of section 1442.5; that section provides in pertinent part as follows: "Prior

---

[2] The notice and attachments thereto are attached as Appendix A to this opinion.

to closing a county facility, eliminating or reducing the level of services provided, or prior to the leasing, selling, or transfer of management, the board shall provide public notice, including notice posted at the entrance to all county health care facilities, of public hearings to be held by the board prior to their decision to proceed. Such notice shall be posted not less than 30 days prior to such public hearings. *The notice shall contain a detailed list of the proposed reductions or changes, by facility and service. The notice shall include, but not be limited to, the amount and type of each proposed change, the expected saving, and the number of persons affected.*

"The board shall make findings based on evidence and testimony from these hearings that their proposed action will or will not have a detrimental impact on the health care needs of the indigents of the county. Such findings shall be included as part of the official public hearing record.

"Notwithstanding the board's closing of a county facility, the elimination of or reduction in the level of services provided, or the leasing, selling or transfer of management of a county facility subsequent to January 1, 1975, *the county shall provide for the fulfillment of its duty to provide care to all indigent people, either directly through county facilities or indirectly through alternative means.*" (Italics added.)

Appellants filed their motion for preliminary injunction on June 15, 1988. In support of their motion they submitted affidavits in which they stated that they could not tell from the notice how they were going to be affected by the proposed reductions. In addition they submitted an affidavit from a public health nurse employed by the City who stated that she was unable to determine from the notice what impact the budget cuts would have in her area of public health. Finally, they submitted an affidavit of E. Richard Brown, an associate professor at the University of California at Los Angeles School of Public Health. In his affidavit Professor Brown stated that, based on his extensive experience, the May 27 notice was excessively vague, and was one of the "vaguest and least informative Beilenson notices"[3] that he had ever seen.

The City issued a second notice on June 21, 1988, which was posted at all county health services on that date and was distributed by mail to other interested parties on June 22. This notice provided much greater detail than the previous notice.[4] On June 24, 1988, the superior court denied plaintiffs'

---

[3] Section 1442.5 is commonly called the Beilenson Act, after its author.

[4] This notice is attached as Appendix B to this opinion. Appellants concede that this notice complied with the statute as to specificity, but they argue that it was untimely and therefore ineffective.

motion for preliminary injunction. The Board proceeded with the June 27 hearing.

DISCUSSION

*Mootness*

Appellants' complaint sought to enjoin the Board's June 27 hearing; to obtain a declaratory judgment that respondents were in violation of section 1442.5 with respect to the hearing set for June 27; and to obtain a writ of mandate requiring respondents to carry out their duties under section 1442.5. ■ Neither this court nor the trial court could issue an injunction or writ of mandamus to prevent what has taken place. "The scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits." (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) ■ Also, as framed, the issue presented in the declaratory relief action is moot. We may, however, decide a matter of public interest which is likely to recur. Although an injunction can no longer be issued to postpone the June 27, 1988, hearing (see *Chase* v. *Brooks* (1986) 187 Cal.App.3d 657, 662 [232 Cal.Rptr. 65]), we may address important issues which are of great public interest, are likely to recur, and may otherwise evade appellate review. (See *Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213].)

No case has addressed the issues of whether section 1442.5 applies to San Francisco and what information must be given in the notice required by that section. There is no dispute concerning the contents of two notices given by the City and these notices are before this court. The parties agree that even if we determine the issues to be moot this action presents an issue of great public interest which should be determined by this court. Both parties argue the merits of the issues presented. It is likely the issues presented will recur and appellate review may be evaded because of the short notice period required by the statute. ■ The construction of a statute and its application to a given set of facts are issues of law which this court may decide de novo; we are not bound by the trial court's resolution. (*San Francisco Police Officers' Assn.* v. *Superior Court* (1988) 202 Cal.App.3d 183, 188-189 [248 Cal.Rptr. 297]; *Goddard* v. *South Bay Union High School Dist.* (1978) 79 Cal. App.3d 98, 105 [144 Cal.Rptr. 701].) We shall proceed to decide the issues.

*Whether the City Violated Section 1442.5*

We must resolve two questions in determining the controversy. The first is whether section 1442.5 applies to all counties in the state or whether San

Francisco as a charter county is exempted from its application due to its unique budgetary process. Second, if we determine section 1442.5 does apply to San Francisco, then we must decide whether the May 27 notice complied with the statute.

*The Statute*

■ The language in dispute in section 1442.5 is found in the first two paragraphs of that section. Appellants contend the language of the section, by itself or through consideration of legislative intent, clearly demonstrates that it is to apply to all counties. Respondents assert, however, that given the unique budgetary process of San Francisco, this section does not apply to it.

■ In interpreting a statute our primary objective is to ascertain the intent of the Legislature and to effectuate that intent. (*San Diego Union* v. *City Council* (1983) 146 Cal.App.3d 947, 954 [196 Cal.Rptr. 45].) As our Supreme Court further stated in *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 818-819 [226 Cal.Rptr. 81, 718 P.2d 68], " '[T]he "intention of the legislature will be determined so far as possible from the language of its statutes, read as a whole, and if the words of an enactment, given their ordinary and popular signification, are reasonably free from ambiguity and uncertainty, the courts will look no further to ascertain its meaning." ' " Further, it is important to keep in mind that " ' "[T]he objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is enlarged or restricted and especially in order to avoid absurdity or to prevent injustice." ' " (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260 [104 Cal.Rptr. 761, 502 P.2d 1049].)

■ With these basic rules as guides we turn to the specific words and phrases in section 1442.5 which are the subject of this dispute.

Respondents note that, unlike other counties, the Board does not have direct control over the budget. Rather, the budget is originated by the mayor, who then submits it to the Board, which in turn can reject it or make further decreases, but cannot increase it. The Board did not initiate the budget cuts which were the subject of the May 27 notice. Respondents then observe that section 1442.5 refers in several places to "their" (the Board's) proposed action or decision to proceed, and they argue that, since the budget reductions were not the Board's, but rather the mayor's, this section does not apply to San Francisco.

We begin our analysis of this argument by first noting that the Legislature has supplied us with guidance as to its intent. The Legislature stated that it "[R]ecognizes the importance of the health care provided by counties to indigent residents through county hospitals and health care facilities. It is the purpose and intent of the Legislature by this act to insure that the *duty of counties* to provide health care to indigents is properly and continuously fulfilled." (Stats. 1974, ch. 810, § 1, p. 1764, italics added.) It would appear that it was the legislative intent to have this section apply to all counties regardless of the internal budgetary processes of those counties. This intent would be consistent with the language in section 1442 which makes it applicable to the "board of supervisors in each county." (Italics added.) Because section 1442 deals with the same general subject as does section 1442.5 (the closing or elimination of health services), the former must be read as part of section 1442.5, evidencing a legislative intent to have section 1442.5 apply to "each" and every county. (*Scott Co.* v. *Worker's Comp. Appeals Bd.* (1983) 139 Cal.App.3d 98, 105 [188 Cal.Rptr. 537, 34 A.L.R.4th 949].)

Respondent argues that, since the Board did not initiate the reductions those reductions are not "their[s]." Solely because the Board did not initiate the reductions, however, does not mean that the Board does not act. Under the charter the Board is charged with final approval of the budget.

This situation is not unlike that in *Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d 247, in which the court rejected the argument that the California Environmental Quality Act (EQA) applied only to public works projects and not projects for which a municipality issues only a permit. In rejecting this restrictive view the court noted that the "protection afforded by the EQA would be substantially diminished in an area where it may be most needed if the act were to be interpreted to cover only public works projects." (*Id.* at p. 264.) The same would be the case here if we were to adopt respondents' position.

■ Respondents' argument also ignores another basic assumption of statutory interpretation; a specific statute must be considered with reference to the entire statutory scheme of which it is a part. ■ ₌ Nothing in section 1442.5 suggests the Legislature intended to limit the counties to which the section applied. To interpret the section to exclude San Francisco would mean that the Legislature was acting by implication, and we will not presume such an action. (*Rapid Transit Advocates, Inc.* v. *Southern Cal. Rapid Transit Dist.* (1986) 185 Cal.App.3d 996, 1002 [230 Cal.Rptr. 225].)

Granted, the Legislature could have used the term "counties" rather than "board" in section 1442.5. Respondents point out that if that had been done

then it would have been clear that section 1442.5 applied to San Francisco, since in respondents' view, it is the City, and not the Board, which initiates the reductions. This view would appear to be in accord with the rule that where a statute contains a different word in one section than it does in other sections or in a similar statute concerning a related subject, then a different intent is shown. (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 507 [247 Cal.Rptr. 362, 754 P.2d 708].) Both parties point out that sections 1442 and 1442.5 use the terms "board" and "county" in many different places. Further, in the Welfare and Institutions Code, the term "county" and "board" are used throughout, suggesting an appreciation by the Legislature of their respective roles.

However, to conclude from this usage that the Legislature intended to except from the statute counties such as San Francisco would not only undermine the express intent of the Legislature to apply the act to all "counties," but would lead to absurd results. (*Sinnamon* v. *McKay* (1983) 142 Cal.App.3d 847, 851 [191 Cal.Rptr. 295].) Further, even if the word "board" were to be read in such a limited way, we would not be held to that meaning if it were contrary to the clear intent of the statute. (*Ibid.*) In this case, we conclude that the Legislature intended the statute to apply to all counties regardless of their budgetary process. To read section 1442.5 in any other way would undermine that intent.

Finally, we note that the first notice of May 27, 1988, stated that the hearing was to be in accordance with section 1442.5. Although respondents now argue that reference was made out of an excess of caution, in the event that section 1442.5 could be held to apply to San Francisco, we find such an argument too self-serving. The Board, even before this litigation commenced, and with knowledge of the statute, stated it was holding a hearing in accordance with the statute.

We conclude that it was the unambiguous intent of the Legislature that section 1442.5 apply to all counties, including San Francisco.

We now turn to the issue of whether the May 27 notice complied with section 1442.5.

*The Notice*

■ We begin our analysis of whether the May 27 notice met the requirements of section 1442.5 by noting that section's recent history. As originally written the section required only "public notice." In 1982 the Legislature amended the section to add the requirement that "The notice shall contain a *detailed list* of the proposed reductions or changes, by facili-

ty and service. The notice shall include, *but not be limited to,* the amount and type of each proposed change, the expected saving and the number of persons affected." (Stats. 1982, ch. 1594, § 7, p. 6305, italics added.) At the same time the notice period was reduced from 90 to 30 days. Moreover, under the section as amended, a board of supervisors could reduce service even if it found that such reduction would be detrimental. Thus, in apparent exchange for a reduced notice period and the authority to reduce services even if detriment were to be found, the requirements of the notice itself were expanded.

■ An amendment to a statute making a material change bespeaks a legislative intent to change the meaning of the statute. (*Jordan v. Consolidated Mut. Ins. Co.* (1976) 59 Cal.App.3d 26, 48 [130 Cal.Rptr. 446].) ■ Here, the Legislature clearly made a material change in the statute. The legislative intent was to go beyond the original statutory requirements and require a much more specific and detailed form of notice. That respondents did not comply with these new requirements is apparent in comparing the May 27 notice with the specific statutory requirements and with the June 21 notice which appellant concedes meets the requirements of section 1442.5. (See Appens. A & B.)

Section 1442.5 requires that the notice include "but not be limited to, the amount and type of each proposed change, the expected saving, and the number of persons affected." Although the May notice does tell us what the "bulk" savings will be for each category, it clearly does not detail the "amount and type of each proposed change." The services to be reduced at San Francisco General Hospital are simply stated as "Patient Advocates"; for Potrero Hill Health Center it is "Out patient – Satellite Clinics"; again at San Francisco General Hospital the cutbacks are stated in the broad categories of "Occupational Therapy," "Outpatient – Hospital Based Clinic," "UC Contract," and "Hospital Staffing." For community public health services the areas of cutback are again broadly stated as being "Contracts" or "Lab Tests," and although in some categories the number of positions to be cut are listed, the exact position(s) and their responsibilities is not listed. This pattern of general nondetailed listing of cutback areas are continued into the community mental health services area where again we find that cutbacks are to be in "Admin. and Program Supervision" or "Outpatient & Day Treatment." There we are not even benefitted by the department's assessment of how many positions will be cut let alone which positions. General and often vague statements of the type of each cutback are also found in the community substance abuse services division, the forensic services, and the public health central office where we are left to ponder the report of a $272,000 cutback in "Administrative" or a cutback in "various operating costs" in administration for the substance abuse services.

By contrast, the June 21 notice provides extensive detail for cutbacks in the community public health services (CPHS) division. In that notice specific information on proposed cutbacks in contract services at the Rose Resnick Center, the Haight Ashbury Free Medical Clinic, and the Refugee Project is provided; whereas these specific facilities are not even separately named in the May 27 notice, a specific requirement of section 1442.5. Where the June 21 notice does list a service also listed on the May 27 notice, much more detail is provided. For example, the May 27 notice referenced "laboratory" cutbacks, to include three positions at a savings of $175,433, which would mean that community neighborhood clinics "that serve indigent patients will not receive all lab services," and that "[t]his may result in fewer clinics willing to treat indigent patients." The June 21 notice says that two microbiologists and one senior microbiologist positions will be cut, and further specific lab services would be affected, as well as which specific community clinics are served by the lab.

The June 21 notice provides much greater detail than the May 27 notice. This type of detail is the kind that we believe the statute prescribes. We also note that the May 27 notice does not provide additional detail as to San Francisco General Hospital, community substance abuse services division, forensic services division and the public health central office. Appellants correctly note that the descriptions of these cutbacks do not meet the statutory requirements.

Both parties to this appeal cite *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315 [118 Cal.Rptr. 637, 530 P.2d 605], and *Carlson* v. *Paradise Unified Sch. Dist.* (1971) 18 Cal.App.3d 196 [95 Cal.Rptr. 650], in support of their respective positions. Both cases dealt with the adequacy of school board notices under former section 966 of the Education Code, which provided that "[A]ll meetings of the governing board of any school district shall be open to the public, and all actions authorized or required by law of the governing board shall be taken at such meetings and shall be subject to the following requirements: . . . . [¶] (b) A list of items that will constitute the agenda for all regular meetings shall be posted at a place where parents and teachers may view the same to at least 48 hours prior to the time of said regular meeting . . . ."

This provision, however, lacks the "detailed list" requirement found in section 1442.5. Therefore, the Supreme Court's holding in *Santa Barbara,* that a school board's notice of intent to adopt a desegregation/integration plan without mentioning which schools were to be affected by the plan satisfied section 966, does not support respondents' position that its May 27 notice satisfied section 1442.5, which contains much more stringent requirements.

*Carlson* is also inapposite. In *Carlson* plaintiff sought to enjoin the defendant school board from closing an elementary school on the grounds that the board's notice of the board hearing to discuss the closure did not specify the school to be closed and therefore violated the requirements of section 966. *Carlson,* like *Santa Barbara,* focuses on entirely different statutory language than the language at issue here.

Respondents rely heavily on a letter dated December 20, 1982, from Dr. Peter Abbott, of the State Department of Health Services, which discusses the notice requirement of section 1442.5. Dr. Abbott stated the notice should contain all "major ideas or concepts to be discussed." He then went on to observe that "The notice should provide adequate information to allow a member of the general public (including persons who may not be knowledgeable about health systems or local government) to decide whether or not to attend the hearing and to prepare informed and relevant testimony if that person attends." The Department's attempt to guide counties in their compliance with section 1442.5 is welcomed. ■ This court, however, is not bound by such opinions, the interpretation of a statute being solely within our domain. Although construction of a statute by an administrative agency responsible for its implementation is entitled to some weight (*Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 866 [167 Cal.Rptr. 820, 616 P.2d 802]), it cannot prevail when there is an apparent contrary legislative purpose (*Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 117 [172 Cal.Rptr. 194, 624 P.2d 244]). Moreover, the department of health services is not charged with the implementation of section 1442.5, and therefore the usual deference to administrative interpretation cannot be given here.

■ Further, where the statute requires a "detailed" notice, a notice that contains only the "major ideas or concepts" is not sufficient. This would not be the detailed notice contemplated by the statute; we refuse to accept that interpretation here.

Rather, we agree with Dr. Abbott's comments regarding the purpose of the notice. The aim of the statute to provide for fully informed and relevant testimony was fulfilled by the detailed notice issued by the Board on June 21. Only that quality of notice allows those attending the hearing to prepare useful testimony on such an important area as reductions in medical and health services.

Nor do we agree that the May 27 notice substantially complied with the statute. ■ Substantial compliance will suffice if the purpose of the statute is satisfied (*Downtown Palo Alto Comm. for Fair Assessment* v. *City Council* (1986) 180 Cal.App.3d 384, 395 [225 Cal.Rptr. 559]) but substan-

tial compliance means *actual* compliance in respect to that statutory purpose. (*International Longshoremen's & Warehousemen's Union* v. *Board of Supervisors* (1981) 116 Cal.App.3d 265, 273 [171 Cal.Rptr. 875].) The doctrine of substantial compliance excuses technical imperfections only after the statutory objective has been achieved. (*International Longshoremen's & Warehousemen's Union* v. *Board of Supervisors, supra,* at p. 273.)

Substantial compliance has been found where a clerk merely failed to timely stamp an order for a new trial (*Dersherow* v. *Rhodes* (1969) 1 Cal.App.3d 733, 745 [82 Cal.Rptr. 138]); where there were typographical errors (*Stasher* v. *Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649]); harmless misstatements in a form contract (*Stasher, supra*); failure to notify all property owners of a property assessment hearing where most of the owners had been notified (*Downtown Palo Alto Comm. for Fair Assessment* v. *City Council, supra,* 180 Cal.App.3d 384, 396); and where the complaint failed to name a corporate defendant although the defendant knew it was being served (*Cory* v. *Crocker National Bank* (1981) 123 Cal.App.3d 665, 671-672 [177 Cal.Rptr. 150]). ▪ Here, the statutory objective to provide for an informed public was not achieved by the May 27 notice. That notice was not merely technically imperfect; it was legally insufficient.

Moreover, the Court of Appeal for the Second District recently rejected a substantial compliance argument in *Ibarra* v. *City of Carson* (1989) 214 Cal.App.3d 90 [262 Cal.Rptr. 485]. In that case proponents of a municipal initiative began circulating the initiative petition for signatures three days before they complied with the posting requirement of Elections Code section 4003. (*Id.* at pp. 94-95.) The city clerk refused to place the measure on the ballot because, without the signatures that were collected during the three days before posting, there were not enough valid signatures to qualify the measure for the ballot. (*Id.* at pp. 93-94.) The superior court denied a writ of mandate to compel placing the measure on the ballot. (*Id.* at p. 93.) The Court of Appeal affirmed the denial; its language is instructive, although the case dealt with a different statute: "Where the purpose of the statutory requirement is to give information to the public to assist the voters in deciding whether to sign or oppose the petition, the substantial compliance argument is often rejected and strict compliance held essential. [Citations.] [¶] In the present case, as we have discussed, the requirement to give notice of intent prior to commencing circulation serves important purposes educating the public about the petition campaign before it begins." (*Id.* at p. 99.)

Here, as in *Ibarra,* the statutory requirement of both timely and sufficient notice also serves to educate the public, in this case about the proposed

reductions in health services; it also allows interested persons enough time to prepare presentations at the hearing. The timely but insufficient notice of May 27 did not fulfill the purposes of the statute. Further, the issuance of an acceptable notice on June 21 does not constitute compliance with the statute. ■ As pointed out long ago, "[w]here [a] statute prescribes a certain kind of notice, a court is not justified in saying that some other kind of notice would be equally effective." (*Ferri v. City of Long Beach* (1917) 176 Cal. 645, 647 [169 P. 385].) We cannot substitute one notice for another where time requirements of the statute have not been met. This is the case even if appellants were aware of the detailed notice prior to the hearing. (See *Todd* v. *City of Visalia* (1967) 254 Cal.App.2d 679, 684 [62 Cal.Rptr. 485].)

We therefore conclude that the May 27 notice did not meet the requirements of section 1442.5. The June 21 notice, to the extent it supplemented the May 27, notice, was statutorily sufficient, but it was untimely. It cannot cure the defects in the original notice.

## DISPOSITION

We remand this case to the trial court with directions to dismiss the action on the ground that it is moot. Appellants are awarded their costs on appeal.

Kline, P. J., and Peterson, J., concurred.

APPENDIX A

## Notice of May 27, 1988

**46**

BOARD of SUPERVISORS

City Hall
San Francisco 94102
554-5184

### NOTICE

Notice is hereby given that the Board of Supervisors of the City and County of San Francisco will hold a public hearing on the effect of changes, including reductions, in services provided at the medical facilities of the City and County, which are proposed by the Mayor to take place in fiscal year 1988-1989, beginning July 1, 1988. The hearing shall be in accordance with the provisions of Section 1442.5 of the California Health and Safety Code. At the conclusion of the hearing, the Board shall adopt a finding that the proposed changes will or will not have a detrimental impact on the health care needs of the indigents of the City and County.

The Public Health Department has prepared the attached list of the proposed reductions. Further information can be provided by telephoning the Health Department at 554-2550. The listing is in two sections. One section shows the level of reductions if Proposition K on the June 7 ballot is approved. The second section shows the level of reductions if Proposition K is not approved.

The hearing will be held on June 27, 1988, at 4 p.m. in the Legislative Chamber on the second floor of City Hall. Public testimony, both oral and written, will be accepted.

John L. Taylor
Clerk of the Board

— RECEIVED —

JUN 8 1988

S.F.N.L.A.F.

EXHIBIT_____

DIVISION: SAN FRANCISCO GENERAL HOSPITAL

13

Annual number currently served: 350,000 – Outpatient
 80,000 – Emergency Room
 22,000 – Inpatient Admissions

| PROVIDER/SITE ADDRESS | SERVICE(S) REDUCED | EXPECTED COST REDUCTION | POPULATION AFFECTED |
|---|---|---|---|
| San Francisco General Hosp<br>1001 Potrero Ave.<br>San Francisco, CA 94110 | Patient Advocates | $75,000 | Affects inpatients who require wheelchair escorts for discharge or ancillary services (35/day) or medication pickup for discharge (35/day). |
| Potrero Hill Health Center<br>1050 Wisconsin St.<br>San Francisco, CA | Outpatient – Satellite Clinics (SFMCOIP) | 250,000 | Approx. 10,000 patients served per year by SFMCOIP neighborhood clinics will receive the same scope of services but experience longer wait times for appointments |
| Southeast Health Center<br>2401 Keith St.<br>San Francisco, CA | | | |
| South of Market Health Center<br>551 Minna St.<br>San Francisco, CA | | | |
| San Francisco General Hosp<br>1001 Potrero Ave.<br>San Francisco, CA 94110 | Occupational Therapy | 107,000 | Approx. 1,960 patients a year receive this service which will be reduced. |
| | Outpatient – Hospital Based Clinics | 250,000 | Approx. 60,000 patients served per year by hospital based clinics will receive the same scope of servic but experience longer wait times for appointments |
| | UC Contract | 1,400,000 | The patients served by SFGH will exper reductions in various service areas but receive the same scope of service |
| | Hospital Staffing | 300,000 | All patients served by SFGH will experience delays in ancillary servic the hospital may have to divert more patients to other hospitals |

A1

EXHIBIT_____

14

DIVISION: COMMUNITY PUBLIC HEALTH SERVICES

An estimated 100,000 San Francisco residents are served by CPHS.

| PROVIDER/<br>SITE ADDRESS | SERVICE(S)<br>REDUCED | EXPECTED<br>COST<br>REDUCTION | POPULATION<br>AFFECTED |
|---|---|---|---|
| CPHS HIA Program<br>Admin. Ofc:<br>101 Grove, Room 323 | Contracts | 17,182 | Low-income residents without insurance will experience delays in health services. |
| CPHS Projects<br>Admin. Ofc:<br>101 Grove, Room 318<br>Southeast Health Ctr<br>2401 Keith St. | Contracts<br>2 Positions | 89,719 | There will be a reduction in transportation services for low-income residents and reductions in primary health care services to low-income residents and refugees. |
| Laboratory<br>101 Grove St. | Lab Tests<br>3 Positions | 175,433 | Community neighborhood clinics that serve indigent patients will not receive all lab services. This may result in fewer clinics willing to treat indigent patients. |
| Laboratory - AIDS<br>101 Grove St. | Lab Tests<br>7 Positions | 316,835 | Patients with sexually transmitted enteric diseases, such as parasites, will experience delays in treatments. |
| Health Centers AIDS<br>City-wide locations | In-home assessment and case management.<br>1 Position | 77,261 | Persons with AIDS/ARC will receive fewer home nurse visits. |
| Records & Statistics<br>101 Grove St | Birth and death registration and certification svcs<br>5 Positions | 133,214 | The public will experience delays in receiving certified copies of birth and death certificates. |
| Disease Control<br>CD - 101 Grove St<br>TB - SFGH, Ward 94<br>STD - 356 - 7th St | TB, STD Control<br>3 Positions | 156,699 | Reduced TB satellite clinic hours and follow-up visits may lead to more cases of undetected tuberculosis. |
| Senior Health Svcs | Contract svcs | 8,015 | Social day care services to seniors, who might otherwise be institutionalized, will be reduced by 30 hours. |

A2

EXHIBIT_____

# served in Mental Health, Substance
Abuse and ensics programs: 35,000
served an_ _ily with direct services;
this does not include those served by
information, referral & education
services provided to all
San Franciscans. **15**

a) **Division:** Community Mental Health Services

| Provider/<br>Site Address | Service(s)<br>Reduced | Expected<br>Cost<br>Reduction | Indigent<br>Population<br>Affected |
|---|---|---|---|
| 1. CMHS Administration | Admin. and<br>Program<br>Supervision | $630,000 | Reduced level<br>of program monitoring<br>may result in<br>disallowed costs;<br>delays in contract<br>processing and payment;<br>delays in report<br>processing for local<br>and state agencies |
| 2. Family Svc.<br>Agency<br>1010 Gough St. | Mental Health,<br>Promotion | $ 30,000 | 800 elderly and<br>seriously mentally ill<br>individuals will not<br>be served at this<br>facility |
| | Aftercare, MIA<br>& Family Service | $ 57,000 | 230 fewer clients and<br>families will be served<br>at this facility |
| 3. Bayview-Hunter's<br>Point Foundation<br>4301 - 3rd St. | Mental Health<br>Promotion | $ 45,000 | 1200 fewer individuals<br>will receive mental<br>health promotion<br>information from this<br>program |
| | Outpatient &<br>Day Treatment | $ 80,000 | 150 fewer clients will<br>receive outpatient<br>services at this<br>facility |
| 4. Richmond Area<br>Service (RAMS)<br>3626 Balboa St. | Mental Health<br>Promotion/<br>Outreach | $ 41,000 | 1100 Youths and<br>adults will not receive<br>mental health promotion<br>services at this facility |
| 5. UC/SFGH Case<br>Management<br>401 Parnassus | Mental Health | $ 16,000 | 400 fewer seriously<br>mentally ill clients<br>will be served by this<br>program |

A3

EXHIBIT

Division: Community Mental Health (Continued)

16

| Provider/ Site Address | Services(s) Reduced | Expected Cost Reduction | Indigent Population Affected |
|---|---|---|---|
| 6. Community Adv. Boards Dist. I CAB 2940-16th St.<br><br>Northeast CAB 1182 Market St.<br><br>District V CAB 1351-24th Avenue<br><br>SFGH CAB Dept. of Psychiatry 1001 Potrero Ave. | | $ 89,000 | 75 Advisory Board members will not have staff support; community involvement & public input in mental health planning may be reduced. |
| 7. Mercy Svcs. Corp (St. Mary's Hosp.) 450 Stanyan | Case Mgt. | 114,000 | 200 clients – will be transferred to other CMHS programs: longer waits for services |
| 8. UC Ctr. on Deafness 3333 California St. | Individual Treatment & Evaluation | $126,000 | 70 hearing impaired children and adults will not be served by this program |
| 9.a)Pacific Presb. 2323 Sacramento | Individual Treatment | $126,000 | 70 children and adults will not be served by this program |
| b)Soc. Skills Day Treatment 501 Hayes St. | Social Skills | $ 33,000 | 10 clients will not be served by this program |
| 10. All Contractors | Contract Cost-of-living Adjustments | $795,000 | 400 fewer clients throughout the system may not be served by the same program |
| 11. Telecare Geriatric/ Garfield Hosp. 1451 28th Ave. Oakland | Skilled Nursing Facility | $ 97,000 | 10 fewer Geriatric patients will be served by this program |
| 12. Mt. Zion Hospital 2330 Post St. | Adult Acute Community Crisis | $400,000 | 500 fewer clients will receive crisis services, at this facility |

A4

EXHIBIT_____

Division: Community mental Health (Continued) 17

| Provider/<br>Site Address | Services(s)<br>Reduced | Expected<br>Cost<br>Reduction | Indigent<br>Population<br>Affected |
|---|---|---|---|
| 13. Suicide<br>Prevention<br>3940 Geary Blvd. | 24-hour tel.<br>crisis | $ 22,000 | 284 fewer clients<br>will receive crisis<br>telephone services<br>from this program |
| 14. Patients' Rights<br>Advocacy Svcs. | Compliance<br>monitoring &<br>complaint<br>investigation | $ 24,000 | 140 fewer clients<br>served by this program |
| 15. Chinese Newcomers<br>Service<br>777 Stockton | Information &<br>Referral in<br>other languages | $ 31,000 | 2,174 fewer phone<br>contacts for information<br>and outreach services<br>will be available |
| 16. 29th Street Clinic<br>10-29th Street | Outpatient | $ 98,000 | 100 clients will be<br>transferred to other<br>clinics for services;<br>they may experience<br>longer waiting times. |
| 17. Westside<br>Outpatient Clinc<br>1140 Oak Street | Crisis Outreach<br>& evaluation<br>outpatient | $112,000 | 125 clients will no<br>longer be served<br>by this program |

EXHIBIT_____

Division: Community Substance Abuse Services 18

| Provider/ Site Address | Services(s) Reduced | Expected Cost Reduction | Indigent Population Affected |
|---|---|---|---|
| Administration 170 Fell St. Rm. 25 San Francisco | 11% reduce various operating costs and implement reduced work week | $ 53,516 | Less grant applications to Federal, State & Foundations. Elimination of 50% of the medical contract evaluations |
| Administration 170 Fell St., Rm. 25 San Francisco | Eliminates 7 positions (Lay-off 5) and maintains Employee Assistance Program (MOU) at current level. Cuts 1 position reducing coordination of community service and grant writing | $178,516 | 900 Civil Service employees/yr. will not receive reduced Employee Assistance Services. 5000 client contact sessions/yr.; 1600 workshop participants; & 2800 information calls would be reduced |
| Contractors COLA | Eliminates cost of living increases to medical service contractors | $182,000 | 320 clients will experience service delays |
| Bayview-Hunter's Point Foundation for Community Improvement, Inc. (Center for Problem Drinkers) 5033 Third Street San Francisco | Home visits, information & referral, and education services | $ 14,830 | 60 Individuals and Families, 1,156 people, will not receive information/referral services from this program |
| San Francisco Pretrial Diversion Project, Inc. 885 Bryant St., 2nd. Floor San Francisco | Evaluation, and advocacy services for persons awaiting trial | $ 5,250 | 600 fewer substance abusing offenders will be served by this program |

A6

EXHIBIT_____

Division: Community Substance Abuse Services

19

| Provider/ Site Address | Services(s) Reduced | Expected Cost Reduction | Indigent Population Affected |
|---|---|---|---|
| Asian American Recovery Services, Inc. 2024 Hayes St. San Francisco | counseling, educational seminars, home visits to substance abusers | $ 33,226 | 2,976 fewer will receive services from this program |
| Youth Projects, Inc. (Drug Detoxification Aftercare) 529 Clayton San Francisco | counseling, home visits non-narcotic, non-maintenance medication services to drug users | $ 24,445 | 200 fewer will be served by this program |
| San Francisco Suicide Prevention, Inc. (San Francisco Drug Lines) 3940 Geary Blvd. San Francisco | informational & referral to the public | $ 13,253 | 2,750 fewer S.F. residents will receive telephone based information & referral services from this program |
| Multicultural Prevention Center, Inc. 1540 Market Street, Suite 320 San Francisco | prevention, education & information services to substance abusers | $ 30,600 | 806 fewer clients (S.F. residents) will receive prevention/ education services from this program |
| Women's Alcoholism Center 2261 Bryant St. San Francisco | outpatient, day treatment & residential services to women alcoholics | $ 73,000 | S.F. women with alcohol problems problems with children will experience delays in service |
| Pacific Mental Health Services, Inc. (Operation Concern) P.O. Box 7999 San Francisco, CA 94120-7999 | counseling, prevention education/ information | $ 11,050 | 1,190 clients with alcohol problems will not be served by this program |
| Westside Community Mental Health Services, Inc. 1153 Oak Street San Francisco | drug-free counseling detoxification with symptomatic AIDS/ARC & other patients | $ 56,000 | 180 clients, primarily Tenderloin residents – with substance abuse addictions, will not be served by this program |

A7 EXHIBIT_____

20

Division: Forensic Services

| | Provider/ Site Address | Services(s) Reduced | Expected Cost Reduction | Indigent Population Affected |
|---|---|---|---|---|
| 1. | Center for Spec. Problems 1700 Jackson St. | Outpatient services | $ 81,525 | 900 fewer clients served (criminal justice clients & victims of crime) by this program |
| 2. | Sexual Trauma Services 50 Ivy Street | Crisis evaluation and outpatient | $ 49,600 | 240 fewer sexual assault victims served; mandated 24-hour service will be provided at SF General |
| 3. | Jail Services 850 Bryant St. 1 Moreland Dr. San Bruno | Consent Decree positions budgeted, but to be phased in during FY 88-89 | $500,000 | None projected |
| 4. | Administration 101 Grove St. | Admin. and program | $237,327 | Compliance with legal mandates & certification requirements will receive less attention |

A8

EXHIBIT_____

886

Administers all Health
Department programs in 2
hospitals and public and
mental health divisions.

DIVISION: __Public Health Central Office__ **21**

| Provider/<br>Site Address | Service(s)<br>Reduced | Expected<br>Cost<br>Reduction | Population<br>Affected |
|---|---|---|---|
| Department of<br>Public Health<br>101 Grove St.<br>San Francisco | Administrative | $272,000 | • Payments to community based agencies, and other service providers will be further delayed; delays in the processing of payrolls, grievances and other personnel matters may result.<br><br>• The ability to assess legislation, analyze programs and to seek grant funding may be restricted, with the result of fewer grant funds available to supplement City services, and more difficulty in effectively managing State regulated programs, including Medi-Cal, Medicare, other services to the indigent and others.<br><br>• Reduced facility and operations support. |
| | EMS Agency | $ 46,000 | • Delays in analysis of data relevant to ambulance operations such as response time, and quality assurance oversight of emergency medical and ambulance care. |

A9

EXHIBIT_____

**22**

DIVISION: <u>Public Health Central Office (Continued)</u>

| Provider/<br>Site Address | Service(s)<br>Reduced | Expected<br>Cost<br>Reduction | Population<br>Affected |
|---|---|---|---|
| Dept. of Public Health<br>101 Grove St., SF | Environmental<br>Health | $368,000 | • Routine inspections to ensure the health and safety, appropriate sanitation services, and cleanliness of hotels will not be performed. Such inspections will be in response to complaints. There will be delays in responses to environmental complaints.<br><br>• Delays in training of City employees at low to moderate risk of toxics exposure. |

A10

EXHIBIT

**23**

B. Reductions that will take effect if Proposition "K" does not pass:

- SF General Hospital
- Community Public Health Services
- Community Mental Health Services
- Community Substance Abuse Services
- Forensic Services

NOTE: Reductions in this category are not proposed for Laguna Honda Hospital or for Public Central Office.

EXHIBIT _____

48

DIVISION: SAN FRANCISCO GENERAL HOSPITAL

Annual number currently served: 350,000 — Outpatient
 80,000 — Emergency Room
 22,000 — Inpatient Admissions

| PROVIDER/SITE ADDRESS | SERVICE(S) REDUCED | EXPECTED COST REDUCTION | POPULATION AFFECTED |
|---|---|---|---|
| San Francisco General Hosp 1001 Potrero Ave. San Francisco, CA 94110 | Hospital Staffing | $2,500,000 | Reduced scope of services in hospital and satellite clinics; Service delays in Medical Records, Housekeeping, Medical Social Services, Dietary, and other areas; Possible problems with state licensing (Title 22) and JCAH standards. |
| Potrero Hill Health Center 1050 Wisconsin St. San Francisco, CA | Outpatient — Satellite Clinics (SFMCOIP) | 100,000 | Approx. 10,000 patients served per year by SFMCOIP neighborhood clin will experience the same scope of ser but longer wait times for appointments |
| Southeast Health Center 2401 Keith St. San Francisco, CA | | | |
| South of Market Health Center 551 Minna St. San Francisco, CA | | | |
| San Francisco General Hosp 1001 Potrero Ave. San Francisco, CA 94110 | MIA Professional Fees | 250,000 | MIA patients will be served by resident rather than attending physicians. 3,200 MIA inpatients/year |
| | Outpatient — Hospital Based Clinics | 250,000 | Approx. 60,000 patients served per year by hospital based clinics wil experience the same scope of services but longer wait times for appointments |
| | UC Contract | 900,000 | All patients served by SFGH will experie reductions in various service areas but receive the same scope of services |
| | Poison Control | 138,000 | 45,237 calls received annually from S.F., Alameda, Contra Costa, Marin, and San Mateo counties will need to be funded through increased revenues from these counties |

EXHIBIT _____

49

DIVISION: COMMUNITY PUBLIC HEALTH SERVICES

An estimated 100,000 San Francisco residents are served by CPHS.

| PROVIDER/ SITE ADDRESS | SERVICE(S) REDUCED | EXPECTED COST REDUCTION | POPULATION AFFECTED |
|---|---|---|---|
| Health Centers<br>#1: 3850 - 17th St.<br>#2: 1301 Pierce St.<br>#3: 1525 Silver Ave<br>#4: 1490 Mason St.<br>#5: 1351 - 17th St.<br>CAS: 50 Ivy St. | Medical,educa-<br>tional and public<br>health nursing<br>17 Positions | 1,036,876 | Approximately 4,713 clients per year by Health centers could be affected. Primarily elderly clients in the Sunset District will no longer receive primary health care services at Health Center #5; health education involving issues such as AIDS, sexually transmitted diseases, substance abuse, etc. will be reduced throughout the district health centers; public health nursing programs in the schools will be eliminated; some adolescents may not receive care. |
| MCH<br>Admin. Ofc:<br>101 Grove St. | Services to<br>disabled children<br>4 Positions | 187,980 | Reduction in hearing and screening and follow-up for school children; reduction in medical, surgical and rehabilitation services to disabled children. |

EXHIBIT_____

# serv 1 Mental Health,
Substa. Abuse and Forensics
programs: 35,000 served **50**
annually, with direct services;
this does not include those
served by information, referral
& education services provided
to all San Franciscans.

**Division:** Community Mental Health Services

| Provider/ Site Address | Services(s) Reduced | Expected Cost Reduction | Indigent Population Affected |
|---|---|---|---|
| 1. Pacific Medical 2323 Sacramento St. | Social Skills Day Treatment | $395,000 | 85 clients will not receive services at this facility |
| 2. 29th Street Clinic 10-29th Street | Outpatient | $150,000 | 150 clients transferred to other clinics; delays in service may result |
| 3. As Yet Undetermined | Res. Facility | $200,000 | 100 residential clients will not be served by this program |
| 4. As Yet Undetermined | Skilled nursing facilities sub-acute care | $200,000 | 44 fewer clients served in skilled nursing facilities |
| 5. Various CMHS Clinics | Outpatient day treatment | $226,000 | 200 clients will not receive outpatient services from this program |
| 6. Billing & Info. Service 551 Polk Street | Billing & collections | $ 75,000 | Delay in collection of revenue |
| 7. As Yet Undetermined | Residential and Outpatient Contracts | $400,000 | 200 fewer clients will not receive this type of service |
| 8. Episcopal Sanctuary 201 8th Street | Mental health promotion (homeless) | $ 20,000 | 100 homeless clients will not receive outreach services from this program |
| 9. Family Service Agency 1010 Gough St. | Geriatric and Family | $ 83,000 | 100 Seniors and 50 family service clients will not receive services from this program |

B3

EXHIBIT_____

Division: Community Mental Health (Continued)

51

| Provider/ Site Address | Services(s) Reduced | Expected Cost Reduction | Indigent Population Affected |
|---|---|---|---|
| 10. Tenderloin Self-Help Mental Health Promotion 191 Golden Gate Ave | Peer counseling, mental health promotion | $225,000 | 500 fewer clients served by this program |
| 11. Instituto Familiar de la Raza 2515 24th St. | MH Education, Outreach | $ 15,000 | 600 children and adults will not receive services from this program |
| 12. Operation Concern 1853 Market St. | Mental Health Education | $ 7,000 | 168 individuals will not receive services from this program |
| 13. District V Home Visiting Team 1351 24th Ave. | Home visits | $100,000 | 150 fewer clients will receive crisis home visits and evaluation from this program |
| 14. St. Mary's Hosp. 450 Stanyan St. Francis Hosp. St. Luke's Hosp. other private hosps. | Acute care beds | $500,000 | 146 fewer clients will be hospitalized at these community hospitals |
| 15. Mt. Zion Hospital 2330 Post Street | Adult Acute Community Crisis | $500,000 | 520 fewer clients will receive crisis services from this service |

B4

**Division:** Community Substance Abuse Services **52**

| Provider/<br>Site Address | Services(s)<br>Reduced | Expected<br>Cost<br>Reduction | Indigent<br>Population<br>Affected |
|---|---|---|---|
| Harriet Street Ctr.<br>444 - 6th Street<br>San Francisco, CA | Non-residential<br>Intake,<br>evaluation and<br>Individual<br>counseling to<br>couples &<br>families.<br>Group counseling<br>for Antabuse<br>evaluation &<br>maintenance | $243,503 | 2500 clients<br>alcoholics, drug<br>abusers & families<br>will not be served<br>by this proram |
| Women's Alcoholism<br>Center<br>2261 Bryant Street<br>San Francisco | Outpatient<br>day care, and<br>residential<br>services to<br>women alcoholics | $ 73,000 | 30 women and<br>40 children of<br>S.F. women with<br>alcohol problems<br>with children<br>will not be<br>served by this program |

B5

EXHIBIT_____

**Division:** Forensic Services **53**

| Provider/<br>Site Address | Services(s)<br>Reduced | Expected<br>Cost<br>Reduction | Indigent<br>Population<br>Affected |
|---|---|---|---|
| 1. Youth Guidance<br>Center<br>375 Woodside Ave. | 24-hour crisis<br>services &<br>medical &<br>psychiatric<br>outpatient<br>services | $189,696 | Follow-up services to<br>200-240 families and<br>youths will not be<br>available at this site |
| 2. Child,<br>Adolescent<br>Resource Center<br>(CASARC) | Crisis<br>services &<br>medical &<br>psychiatric | $ 97,221 | 120 fewer sexual abuse<br>victims who need<br>follow-up care will be<br>served by this program |

B6

EXHIBIT_____

## APPENDIX B

## Notice of June 21, 1988

**City and County of San Francisco** **Department of Public He**

$224$

INFORMATION ON CHANGES IN PUBLIC HEALTH SERVICES

On Monday, June 27, the SF Board of Supervisors will hold hearings on proposed changes, including reductions in services provided at medical facilities of the City and County of San Francisco. Notice of the hearings was issued on May 27, 1988. Attached to the notice was a description of various changes in services provided by the Department of Public Health, including the Community Public Health Services Division.

Attached is further information on changes proposed for the Community Public Health Services Division of the SF Department of Health.

For more information, please call Beverly Hayon, Public Information Officer at 554-2550.

2698d

*EXHIBIT 3*

Expected date of service changes: July 1, 1988 225

(1) CPHS MIA Pro⌐ ⌐m - Attendant and Hospice Care for Medically Indigent
Adults with AIDS/ARC: Staff of the Visiting Nurses Association provide care
in the home for indigent persons with AIDS or with AIDS Related Conditions.
Attendants who are trained by the agency, but are not licensed health care
providers, assist clients to dress, bathe, clean, prepare meals, and run
errands.

 Site: Services are provided in the patient's home; the contract is
 administered at 101 Grove Street, S.F.
 Nature of Reduction or Change: The services will continue to be provided
 through grants and Medi-Cal funding.
 Staff reductions: To be determined by contractor.
 Patients affected: Approximately 4 patients/day now receive this
 service. This will be reduced to 2 patients/day.
 Expected savings: $65,000/year.

(2) CPHS Projects
 (A) Rose Resnick Center: The Health Department contracts with this
 agency to provide taxi vouchers for low-income and indigent persons who
 are handicapped or disabled, who need such assistance in order to get to
 medical appointments.
 Site: 1299 Bush Street
 Nature of Reduction or Change: None anticipated; thecut in City
 funding will be made up through other funding sources.
 Staff reductions: None.
 Patients affected: None anticipated.
 Expected savings: $4,000.

 (B) Haight Ashbury Free Medical Clinic: The Clinic provides free primary
 health care; patients with any kind of medical problem, who want to see a
 doctor, are diagnosed and treated.
 Site: 558 Clayton Street
 Nature of Reduction or Change: All current services will continue to
 be provided, but there may be longer waiting times because of the
 reduction in contract funding.
 Staff reductions: 1 Registered Nurse, 2 Nurse·Practitioners, 1
 Physician Assistant. Hours may be reduced.
 Patients affected: The Clinic receives funding from various sources;
 because of the reduction described here, patients may experience
 delays in scheduling appointments.
 Expected savings: $25,000.

 (C) Refugee Project: Immigrants and refugees receive free primary health
 care; if they feel they need to see a doctor, they are treated by the
 project. They are provided with diagnoses of their problems, and
 treatment for the problem.
 Site: 1001 Potrero, S.F. General Hospital
 Nature of Reduction or Change: Current services will continue to be
 provided, but there may be longer waiting times because of the
 funding reduction.
 Staff reductions: One Health Worker/Translator reduced to .65 full
 time hours.
 Patients affected: The Clinic received funding from various sources;
 because of the reduction described here, patients may experience
 delays in scheduling appointments and will not have translation
 services available.
 Expected savings: $15,000

896

(3) Southeast Health Center: Reference on page "A2" of the notice was in error. This change is described in the section of the notice regarding San Francisco General Hospital (pages "A1" and "B1").

(4) Laboratory: Provides laboratory analyses of tests of blood, urine and throat cultures by physicians at community clinics (Haight Ashbury Free Medical Clinic, the Mission Neighborhood Health Center, the Southeast Health Center, the Potrero Hill Health Center, the South of Market Health Center, SFGH, and Health Centers.)
 Site: 101 Grove Street, S.F.
 Nature of Reduction or Change: Test analyses of blood, urine and throat culture to the community clinics (listed above) that diagnose patients with communicable diseases, rubella, tuberculosis, hepatitis, gastrointestinal salmonella will be reduced.
 Staff reductions: 2 "2462 Microbiologist"
 1 "2464 Senior Microbiologist"
 Patients affected: Physicians at these clinics send specimens for 20,900 clients a year for analysis at the Public Health Laboratories.
 Expected savings: $188,433

(5) Laboratory: Provides laboratory analyses of blood, urine and throat cultures taken by physicians in Health Department clinics and health centers, and by physicians at community clinics (the Haight Ashbury Free Medical Clinic, the Mission Neighborhood Health Center, the Southeast Health Center, the Potrero Hill Health Center and the South of Market Health Center.)
 Site: 101 Grove Street, S.F.
 Nature of Reduction of Change: 7 laboratory positions currently funded with City funds will be funded through AIDS grant funds for the purpose of HIV antibody testing analyses. These 7 positions also provided some testing of sexually transmitted enteric diseases, such as parasites. The testing of the sexually transmitted enteric diseases may be somewhat reduced because the AIDS grant funds may be used only for HIV testing analysis.
 Staff reductions: None; all positions will be funded by AIDS grant funds. However, 7 positions will be deleted from the General Fund budget:
 3 "2416 Bacteriology Laboratory Technician"
 2 "2462 Microbiologist"
 1 "2462 Microbiologist"
 1 "1424 Clerk Typist"
 Patients affected: Approximately 2,000 enteric disease specimens are analyzed in the labs each year. This number may be somewhat reduced.

(6) Health Centers AIDS – AIDS Case Management and Liaison: Currently, the City funds 1.5 public health nurses to provide home nursing care, or to work on the streets to contact persons at risk of AIDS or ARC and to educate them in order to avoid their contracting the disease.
 Site: Services provided at home, or in the streets. Staff are administered through 101 Grove Street, S.F.
 Nature of Reduction of Change: No reduction in services is anticipated.
 Staff reductions: 1.5 positions will be funded with grant funds and no longer be reflected in the General Fund budget:
 1.5 "2830 Public Health Nurse"
 Patients affected: None anticipated.
 Expected savings: $77,261

Page Three: Community Public Health Changes effec~ ~e July 1, 1988 227

(7) **Records and Statistics Unit:** The Records and Statistics Unit provides certified copies of birth and death certificates by mail and in person, and compiles data used to prevent the spread of disease.
 Site: 101 Grove Street, S.F.
 Nature of Reduction of Change: Birth and death certificates will be processed more slowly. Currently, they are processed within two days; after July 1 processing may take up to two weeks.
 Staff reductions: 5 "1404 Clerk"
 Persons affected: Anyone who needs a birth or death certificate may be affected.
 Expected savings: $133,214

(8) **Disease Control Clinics:** Health Department Clinics that specialize in the treatment of sexually transmitted diseases serve all persons who may have contracted such diseases.
 Sites:
 Communicable Disease Clinic: 101 Grove Street, S.F.
 Tuberculosis Clinic: Ward 94, S.F. General Hospital, 1001 Potrero St.
 Sexually Transmitted Disease Clinic: 356 7th Street, S.F.
 Nature of Reduction of Change: Procedures at each clinic will be changed as follows: only physician staff will discuss necessary followup treatment measures with patients; this may delay the scheduling of followup appointments. Currently, other clinical staff as well as physcians discuss followup ssues with patients. There will also be some delay in patients' receipt of drugs.
 Staff reductions: 1 "2806 Disease Control Investigator"
 1 "2586 Health Worker II"
 1 "2450 Pharmacist"
 Persons affected: Number treated at each clinic may experience longer waits or delays in their appointments.
 Expected savings: $156,699

(9) **Senior Health Services:** The Health Department funds the Downtown Senior Center for services to seniors who would otherwise be institutionalized. These services entail recreational activities and other day care services that are provided by personnel who are not licensed health care providers.
 Site: Downtown Senior Center — 481 O'Farrell Street
 Nature of Reduction of Change: Some of the seniors who require such services will be referred to other facilities, or will not receive these services.
 Staff reductions: .5 Social Worker (half-time)
 Persons affected: Approximately 3,067 of the 9,202 indigent seniors served through Health Department funding may be affected.
 Expected savings: $10,000.

898

(10) Health Centers Administration: Provides administrative services to the district health centers and clinics. In addition, provides information on the prevention of disease and promotion of public health for the public and health personnel.

 Site: 101 Grove St., S.F.

 Nature of Reduction of Change: Fewer persons will be available to provide the services described above.

 Staff reductions: 1 "1406 Senior Clerk"
 1 "2832 Supervising Public Health Nurse"
 1 "1424 Clerk Typist"
 1 "2320 Registered Nurse"
 1 "2824 Chief Health Educator"

 Persons affected: Not determinable; indirectly affects all users of public health services.

 Expected savings: $142,333

(11) CAS - 50 Ivy Street - Tom Waddell Clinic: Currently, the Tom Waddell Clinic provides emergency medical services to individuals who come into the clinic at any time. As part of the Clinic's shift to specialization in the treatment of the homeless, and to AIDS/ARC patients in the Tenderloin/Civic Center/South of Market area, patients requiring emergency services between the hours of 12:00 midnight and 8:00 a.m. will be treated at the S.F. General Emergency Room.

 Site: 50 Ivy Street, S.F.

 Nature of Reduction of Change: Urgent medical services will no longer be provided at this site between the hours of 12:00 midnight and 8:00 a.m.

 Staff reductions: 1 "2320 Registered Nurse"
 1 "1424 Clerk Typist"

 Persons affected: An average of 40 persons a week currently come to the Clinic during these hours.

 Expected savings: $78,000 in Community Public Health services.

COMMUNITY PUBLIC HEALTH S. 'ICES 229
Expect__ date of service changes: July 22, 1988 or later

**(1) Health Center #5:** Currently, the Health Center provides primary health care for people who need diagnoses and treatment for minor health problems or medical conditions, including regular checkups for infants and children.
　　**Site:** 1351 24th Street, S.F.
　　**Nature of Reduction or Change:** The Center will discontinue the medical services described above; patients will be referred to other health care facilities or providers, including the four other district health centers and S.F. General Hospital, which may consequently experience longer waiting times for appointments.
　　**Staff reductions:**
　　　　　　　　6 "2830 Public Health Nurse"
　　　　　　　　1 "2320 Registered Nurse"
　　　　　　　　2 "2230 Physician Specialist"
　　**Patients affected:** Approximately 12,000 patient visits a year currently provided at Health Center #5.
　　**Expected savings:** $621,286

**(2) Health Center #2:** The Health Center provides primary health care for people who need diagnoses and treatment for physical problems or medical conditions, including regular checkups for infants and children. Physician services, and administrative services at Health Center #2 will be reduced.
　　**Site:** 1301 Pierce Street, S.F.
　　**Nature of Reduction or Change:** Physician time will be reduced by 20 hours a week, thus reducing the time for the Adult Screening Clinic by 10 hours. The adult screening clinic provides diagnoses for any adult who has a health or medical problem. In addition, the number of clerks, who process medical records and schedule appointments, will be reduced. This will lead to delays in the scheduling of appointments, and in the updating of records and billing information.
　　**Staff reductions:** .5 Physicians (paid out of Temporary Salaries Account)
　　**Patients affected:** Approximately 9,000 patient visits a year are provided at Health Center #2. 2,000 of these are provided in the Adult Screening Clinic.
　　**Expected savings:** $37,500

**(3) Health Center #4:** The Health Center provides primary health care for people who need diagnoses and treatment for physical problems or medical conditions, including regular checkups for infants and children. Provides outreach program to identify refugees or immigrants who need treatment but are unaware of the services that are available. The Women's Clinic provides routine checkups and diagnoses for women clients.
　　**Site:** 1490 Mason Street, S.F.
　　**Nature of Reduction or Change:** Refugee and immigrant outreach program will be reduced by 2 staff (currently, there are 3 staff). Also, physician hours will be reduced by 20 hours a week, thus reducing the time for the Women's Clinic by 15 hours a week, from 20 hours to 5 hours.
　　**Staff reductions:** 2 "2585 Health Workers"
　　　　　　　　.5 Physicians (paid out of Temporary Salaries Account)
　　**Patients affected:** Approximately 15,000 refugees and immigrants who need treatment are identified each year; approximately 92,000 patient visits a year are provided at the Health Center #4 Women's Clinic.
　　**Expected savings:** $83,237

900

(4) Materials and Supplies at the Health Centers: Staff at the five district
health centers are required to follow careful infection control procedures in
order to minimize the risk of infections to patients or staff.
> Site: Health Center #1: 3850 17th Street, S.F.
> Health Center #2: 1301 Pierce Street, S.F.
> Health Center #3: 1525 Silver Avenue, S.F. 230
> Health Center #4: 1490 Mason Street, S.F.
> Health Center #5: 1351 24th Street, S.F.
> Nature of Reduction or Change: Materials and supplies may be less readily
> available to Health Center staff. No direct patient effects anticipated.
> Staff reductions: None.
> Patients affected: No reduction in service is anticipated.
> Expected savings: $85,000.

(5) Services in the Public Schools: The School District is mandated to
screen its students to identify hearing problems and provide any necessary
followup treatments. Currently, these services are provided by the Department
of Health.
> Site: all public schools; administered at 101 Grove Street, S.F.
> Nature of Reduction or Change: The School District must assume the
> responsibility for these services and identify staff to provide them.
> Staff reductions: 3 "2538 Audiometrists"
> Patients affected: No reduction in service is anticipated.
> Expected savings: $187,980.

0288n